## EXHIBIT A

## AFFIDAVIT OF SPECIAL AGENT EUGENE M. DIFIORE

I, Special Agent Eugene M. DiFiore, being duly sworn, do hereby depose and state as follows:

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been employed in that capacity for approximately twelve years. I am currently assigned to the Logan Airport Task Force ("LATF"), based at Logan International Airport in East Boston, Massachusetts. The LATF is comprised of police officers from the Massachusetts State Police ("MSP"), and Special Agents from Homeland Security Investigations and the DEA. The mission of the LATF is to prevent the flow and transport of illegal narcotics and bulk United States currency related to the sale of narcotics, using the resources of the participating law enforcement agencies.

2. Prior to my employment with the DEA, I was employed as a police officer with the Methuen Police Department in Methuen, Massachusetts, from 1995 to 1999. I also served as a police officer with the Amesbury Police Department in Amesbury, Massachusetts, beginning in 1999, until I accepted a position as a criminal investigator with the DEA in 2005.

3. Through prior investigations and training, I have become familiar with the methods, language, and terms that are used to disguise the source and nature of illegal narcotics activities. I have conducted or assisted in a number of narcotics investigations. I have testified in criminal trials, in both federal and state courts, as a result of my involvement in those investigations. I have also applied for, been issued, and have executed search warrants in furtherance of narcotics investigations.

4. I submit this affidavit in support of a Complaint for Forfeiture *in Rem* against the following property:

$36,000 in United States currency, seized from Zachary J. Battaini at Boston Logan International Airport on November 26, 2016 (the "Currency").

5. This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to establish probable cause for forfeiture of the Currency.

6. This affidavit is based upon my personal knowledge, training, and experience, as well as information provided to me by law enforcement personnel involved in the investigation, and my review of records and reports relating to the investigation.

7. As set forth below, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6), because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

## Seizure of the Currency

8. On Saturday, November 26, 2016, at approximately 6:30 p.m., Transportation Security Administration ("TSA") officers detected a large amount of currency in Zachary J. Battaini's ("Battaini") baggage during routine screening at the security checkpoint of Jet Blue Airlines in Terminal C at Logan International Airport in Boston, Massachusetts. Battaini was booked on Jet Blue Flight #497, a one-way flight to Seattle, which was scheduled to depart at 7:15 p.m.

9. I responded to Terminal C, along with Detective Lieutenant Thomas Coffey ("Lt. Coffey") and Sergeant Steven Lopes ("Sgt. Lopes"). Upon arrival, TSA officers directed us to

Battaini's carry-on bag, a small green duffel bag. We introduced ourselves to Battaini, told him that he was free to leave at any time, and that he was not obligated to speak with us. Battaini agreed to speak with us.

10. Sgt. Lopes and Lt. Coffey asked Battaini if the carry-on bag was his, and he admitted that it was. When they asked Battaini why he was traveling to Seattle, he said he was traveling to Seattle to purchase high-end blown glass. Based on my training and experience, I am aware that the term "blown glass" commonly refers to marijuana smoking pipes. Battaini admitted that the carry-on bag contained $30,000 in United States currency that he was going to use to purchase blown glass from a business called "Uncle Ikes." Battaini added that he traveled to Seattle every two weeks with the same amount of cash in order to buy blown glass.

11. Sgt. Lopes and Lt. Coffey asked Battaini when he made his flight reservation to Seattle, and Battaini said he made the reservation the day before. Battaini said he planned to return to Boston the following Monday or Tuesday, but had not yet booked a return flight. Battaini said that when arrived in Seattle, Washington, he was planning to stay at a hotel called Extended Stay, located in Tukwila, Washington, which is approximately ten miles from Seattle.

12. Sgt. Lopes and Lt. Coffey asked Battaini how he obtained the $30,000 in United States currency that was in his carry-on bag. At first, Battaini said the currency was his, and that he earned it from "donations" he received for medical marijuana. Battaini told Sgt. Lopes that he had a medical marijuana ID card, and after asking Battaini to show us the card, without hesitation, he showed us what appeared to be a Massachusetts medical marijuana card. When asked about the marijuana "donations," Battaini said he generally would give his friends .5 to 1 gram of marijuana, and in exchange, he would accept monetary donations. Battaini also stated that he would not give his friends marijuana unless they made a donation. He went on to explain

3

that he made $50,000 per year by accepting donations for marijuana, and that he claimed the money as earned income on his tax returns.[1]

13.   Sgt. Lopes and Lt. Coffey continued to ask Battaini questions about the currency. Battaini then said that $20,000 of the currency in the carry-on bag was from his father, who was the vice-president of an insurance company. Battaini said that he and his father shared a joint bank account. When they asked Battaini for further details about the joint bank account, Battaini changed his story and admitted that he did not share a joint bank account with his father. Although Battaini was not specifically asked why he changed his story, he offered no explanation as to why he lied. Battaini also said that he recently purchased a home in Fitchburg, Massachusetts for $280,000, and when asked how the property was financed, Battaini stated that he did not have a mortgage on the home.

14.   During the conversation with Battaini, we noticed that he was holding a cell phone in his hands. Sgt. Lopes and Lt. Coffey asked Battaini for consent to look at the cell phone. Upon doing so, Battaini verbally consented. While examining the contents of the cell phone, Lt. Coffey saw text messages indicative of marijuana sales. When asked about the text messages, Battaini admitted that he sold marijuana and marijuana wax in Massachusetts. Marijuana wax, also known as BHO or Butane Hash Oil gets its name from its oily and honey like appearance. When the marijuana oil becomes increasingly firm, it takes on a waxy like appearance. Battaini said that he believed selling marijuana was legal in Massachusetts, but illegal federally. He also admitted to purchasing marijuana from "Washington Mike," but

---

[1] Even assuming Battaini possessed a valid Massachusetts medical marijuana registration, it was illegal in Massachusetts at all times prior to the date of seizure, to sell, gift, share or otherwise distribute marijuana obtained pursuant to such a registration.

offered no additional information. Battaini also did not state whether "Washington Mike" was his only marijuana source of supply.

15. Sgt. Lopes and Lt. Coffey also asked Battaini for consent to search his carry-on bag, as well as his checked luggage. Battaini again verbally consented. A large amount of currency, later determined to be $30,000, was found in Battaini's carry-on bag. The currency was bundled in several groups with an elastic band. Battaini's checked luggage, a green duffel bag with green straps (the "checked bag"), was retrieved from the airplane by airplane personnel. Located in the checked bag was a blue nylon bag. In the side pocket of the blue nylon bag was a large bundle of currency, later determined to be $6,000, banded with elastic bands. The checked bag also contained a Food Saver heat sealer and a box of Food Saver heat sealed plastic bags. Through my training and experience, I know that these items are used for smuggling bulk currency and/or narcotics.

16. Sgt. Lopes told Battaini that the Currency was going to be seized as proceeds of illegal marijuana sales. Sgt. Lopes, explained to Battaini that he was free to continue his travel, but that he could go to the Massachusetts State Police ("MSP") – Troop F Barracks (the "Barracks") to receive a signed receipt for the Currency. Battaini said he wanted to go to the Barracks.

17. After we arrived at the Barracks, Sgt. Lopes requested assistance from a MSP Canine Unit certified in narcotics detection. Prior to the MSP Canine Unit's arrival, I took the two separate bundles of currency from Battaini's bags, put the Currency in separate large manila envelopes, and placed the envelopes randomly in the Barracks' office space. Specifically, without the knowledge of the canine handler, I placed the two bundles in separate unoccupied desk drawers.

18. MSP Trooper Brian Bonia ("Trooper Bonia") and his canine partner, Maximus, responded to the Barracks. Trooper Bonia has been employed by the MSP for 12 years, and has been assigned to the MSP canine unit since March 2008. Maximus is a 9-year old German Shepherd trained in the detection of narcotics odor. Trooper Bonia uses Maximus in the detection of controlled substances in different situations including interdiction investigations. In October of 2008, Trooper Bonia and Maximus attended and completed a 320-hour course in narcotics detection through the New England State Police Administrators Conference ("NESPAC"). As a result, Maximus is certified to detect marijuana, cocaine, heroin, and methamphetamine. Trooper Bonia and Maximus attend recertification on a yearly basis. Their most recent certification was completed on May 24, 2016. Since the initial NESPAC accreditation course, Trooper Bonia and Maximus have maintained their training at a minimum of 16 course hours per month. Searches conducted by Maximus have led to the seizure of marijuana, cocaine, heroin, and methamphetamine.

19. When Trooper Bonia and Maximus arrived to the Barracks, they searched the office space where the Currency was located. Maximus alerted to the odor of narcotics where I had placed the two separate bundles of currency.

20. The Currency seized from Battaini totaled $36,000, comprised of 1,800 twenty-dollar bills. Of the total amount of currency seized, $30,000 was located in Battaini's carry-on bag, and $6,000 was located in Battaini's checked luggage. The Currency was then processed and transported to Citizens Bank, where it was counted and deposited.

## Conclusion

21.  Based upon the information set forth above, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

Signed under the pains and penalties of perjury this ___7___ day of April, 2017.

_____
Eugene M. DiFiore, Special Agent
United States Drug Enforcement Administration